UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 20-50083 |
| Plaintiff, | |
| | UNITED STATES' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS |
| v. | |
| LUCIAN CELESTINE, a/k/a Lucian Unddascha Celestineaeterus, a/k/a Dillon Joseph Calvetti, | |
| Defendant. | |

Comes now the United States of America, by and through Assistant United States Attorney Eric Kelderman, and files this supplemental memorandum in opposition to the defendant's motion to suppress.  Docs. 25 and 26.

**BACKGROUND**

The Court conducted a hearing on the defendant's motion on November 23, 2020.  At the hearing, the United States informed the Court it would submit a supplemental memorandum, which would include citations to specific portions of the exhibits or evidence that would assist the Court in ruling on the motion. See Transcript of Suppression Hearing ("HT") at 4.  The Court ordered the parties to submit supplemental briefing after the transcript was filed.  HT 77.

As noted during the suppression hearing, three segments of video recordings related to the defendant's contact with law enforcement on June 30, 2020, are contained in Exhibit 1.  HT 41.  Sequentially, the first recording is

labelled "FOLL-5."  A filed labeled "FOLL-3" is the second video.  And the final video of Celestine's contact with law enforcement on that date is labeled "FOLL-4."  See HT 41; Exhibit 1.

The following paragraphs outline approximate times in these videos at which relevant matters addressed during the suppression hearing occurred.  At times, the time listed is the starting point for the relevant conversation.  On the video labeled "FOLL-5," the following events are depicted.

Special Agents Flint and Abruscato and Deputy Milstead (hereafter "the agents" unless individually named) arrived at the residence and talk to the defendant's mother briefly.  FOLL-5 at 1:04.  The defendant walked out of house and approached the agents.  Id. at 3:33.  The defendant picked up a dog and walked away with it, seemingly to put the dog in the house and away from the area in front of the house.  Id. at 4:15.  The defendant then returned to where the agents were standing when they first introduced themselves.  Id. at 4:55.

After some initial conversation, Special Agent Flint asked the defendant if he had a gun.  Id. at 5:45.  A conversation followed during which the defendant stated he had acquired the firearm in the last couple of days.  Id. at 6:10.  The defendant identified his vehicle as a Volkswagen Passat.  Id. at 9:26.  The agents asked the defendant if they could see the gun, and he turned as if to start walking toward the direction he had pointed toward the vehicle.  Id. at 9:58.

Special Agent Flint asked the defendant to hold on for a moment so a consent form for a search could be filled out.  Id. at 10:04.  While Special Agent Flint was filling out the form, Deputy Milstead stepped away.  Id. at 11:06.

2

Deputy Milstead return about one minute later.  Id. at 12:08.  The defendant commented that he regularly smoked marijuana and had done so the day before. Id. at 12:45 (approx.).  Special Agent Flint presented the defendant with two forms, including a consent for release of medical forms and a consent to search the defendant's room in the house and his vehicle.  Id. at 13:52-16:30.  When Special Agent Flint had completed the medical release form, the defendant took the pen from him and signed the form.  Id. at 14:13.  Special Agent Flint then showed the defendant the consent to search form.  Id. at 14:52.  The defendant asked why but said they could search the car.  Id. at 14:58.  The agents explained the purpose of their request to search, informing the defendant they were not interested in a small amount of marijuana.  The defendant again took the pen from Special Agent Flint.  Id. at 15:41.  After further discussion about the issue of marijuana, Special Agent Abruscato explained the agents were not concerned about the small amounts.  Id. at 16:07.  The defendant signed the consent to search form.  Id. at 16:20.

The defendant then walked freely to his vehicle, leading the agents to it. Id. at 16:47.  Deputy Milstead asked the defendant to unlock the door to allow the agents to look in.  Id. at 16:58.  The defendant opened the trunk of the vehicle.  Id. at 17:22.  The agents looked in the trunk and saw a rifle.  The defendant stated he had shot the firearm on time.  Id. at 17:49.  Special Agent Flint asked the defendant some biographical questions, and the agents talked to the defendant near the vehicle.  Id. at 20:35.  Deputy Milstead was too far away to catch all portions of the conversation, but at different points, the defendant

3

mentioned he had been hospitalized for mental health treatment at Yankton. Id. 26:55. The defendant also stated he was not taking his medications. Id. at 27:55.

The agents then asked the defendant if he was still OK with going inside the house. Id. at 32:27. The defendant led the agents to the house for the search. Id. at 33:07. Deputy Milstead and Special Agent Abruscato conducted a search of the defendant's room. Id. at 34:00

Later, the agents decided the defendant would be detained on a mental hold, and he was detained and handcuffed. Id. at 1:16:00. Deputy Milstead walked the defendant to his patrol vehicle. At the vehicle, the defendant asked questions, and Deputy Milstead advised him of why he was being detained, including statements he had made and his mental health history. Id. at 1:17:40. The defendant was transported to the Pennington County Public Safety Building, where he was placed in a room at the Criminal Investigation Division ("CID") offices. HT 27, 56-57; FOLL-5 at 2:14:38.

On the video labeled "FOLL-3," the following events are depicted. Deputy Milstead entered the room at the CID, and the audio on his body-worn camera begins at the :30 point. FOLL-3 at 0:30. Deputy Milstead informed the defendant he was being detained on a mental hold, explained the mental hold, and answered some questions from the defendant about it. Id. at 0:56. The defendant continued to ask question about why he was. Deputy Milstead explained the concerns about his mental health issues and statements he had made were the reasons for the involuntary mental hold. The defendant stated

he had the right to own a gun under the Second Amendment. Id. at 1:48. Deputy Milstead informed the defendant he was not under arrest, but going in on involuntary mental hold instead. The defendant stated the hold was illegal and continued to talk. Id. at 2:48. Deputy Milstead stepped out of the room and then returned minutes later. Id. at 7:50. He addressed the defendant, stating "Alright, Lucian," and the defendant began talking about how Deputy Milstead has no right to take him in on a mental hold. Deputy Milstead responded by explaining the reasons for it, that the defendant was not taking his medication and was smoking marijuana daily. Id. at 8:15. The defendant continued to talk and interrupt Deputy Milstead's explanation. At one point in the conversation, the defendant said voices had directed him to shoot the President. Id. at 10:40. Deputy Milstead paused to think about what the defendant had just told him, then responds that he is going to advise the defendant of his rights. Id. at 11:29. Deputy Milstead advised the defendant of his rights. Id. at 11:41. The defendant said he was willing to talk, and Deputy Milstead interviewed him. Id. at 12:00.

## ARGUMENT AND AUTHORITIES

The United States believes its prior memorandum sufficiently presents its legal arguments with regard to the search of the defendant's vehicle. Accordingly, it presents no further argument on that topic. As to the defendant's statements, both outside his home and at the CID offices, the United States offers these additional arguments.

The Eighth Circuit has observed, "[n]ot every confession obtained absent the Miranda warnings is inadmissible . . . because 'police officers are not required

5

to administer <u>Miranda</u> warnings to everyone whom they question.'" <u>United States v. LeBrun</u>, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)).  It is well-established that advisement of rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), is not required for a non-custodial interview.  <u>Beckwith v. United States</u>, 425 U.S. 341, 346-48, n.7 (1976).  "<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was that sort of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited.'" <u>LeBrun</u>, 363 F.3d at 720 (quoting <u>Mathiason</u>, 429 U.S. at 495).  However, even when not formally arrested by police, a suspect can still be considered in custody if the person's "freedom of action is curtailed to a 'degree associated with formal arrest.'" <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (quoting <u>California v. Beheler</u>, 463 U.S. 1121(1983)).

Several matters are relevant to a determination of whether an interview is custodial in nature.  <u>See</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990); <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002).  In <u>Griffin</u>, the court identified six factors which are relevant to evaluating whether a person has been subjected to a custodial interview.  <u>Id.</u>  Those factors include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6)

6

whether the suspect was placed under arrest at the termination of the questioning.

Id.

While the factors in Griffin are helpful, they are not to be applied "ritualistically." United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004). The court in Czichray noted it had "recently resolved the question of 'custody' as an *en banc* court with nary a mention of Griffin." Id. (citing Lebrun, 363 F.3d at 719-24). "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." Czichray, 378 F.3d at 828.

When determining whether a suspect is in custody, this Court has stated "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." Griffin, 922 F.2d at 1349. The surroundings of the interview are also important. "When a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" Czichray, 378 F.3d at 828 (quoting United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985)). As noted in Miranda, "an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody." Miranda, 384 U.S. 450.

The conversation among the defendant and the agents at his residence was not custodial. The defendant had complete and unrestrained freedom of

movement, approached the agents on his own, left their presence to put a dog away, then returned to the agents' location and continued to talk to them. He spoke freely to the agents, and no coercion was used to get him to talk. At the time when he was asked if the agents could look at his gun, the defendant turned to walk toward his vehicle until SA Flint asked him to sign a consent form. He walked freely to the vehicle after signing the consent to search form, taking the route of his choice, without direction from the agents. No strong-arm tactics or stratagems were employed. The agents were not deceptive. While there were three law enforcement officers present, it was not a police-dominated location. Instead, it occurred at the defendant's residence, where he moved unrestrained. Although he was detained for a mental hold at the end of the encounter, he was made no promises that he would not be arrested. In other words, his later detention had no impact on the voluntariness of statements made at the scene.

When he was detained outside his home, the defendant was explicitly informed he was not under arrest for a crime but was being placed on a mental hold due to statements he had made and actions he had taken. At the CID offices, the defendant was repeatedly informed he was not under arrest. The United States does not contest, however, that the defendant was in custody at the point when he was detained in the patrol vehicle outside his residence.

Further, no interrogation was occurring inside those offices. As Deputy Milstead explained at the suppression hearing, the defendant became agitated when informed he was being placed on a mental hold—both outside his home and at the CID. At the CID, the defendant continued to talk as Deputy Milstead

8

talked to him in an effort to de-escalate the volatile situation. HT 62. Although he asked some questions, the questions were not interrogation, but instead were questions made in response to comments the defendant made and were done in order to address the defendant's concerns.

Regardless, even if any of the defendant's statements made after the defendant was detained but before Miranda warnings were provided could be considered the result of a custodial interrogation, only those statements would be suppressible. The Miranda requirements "are triggered only when a defendant is both in custody and being interrogated." United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005). Miranda warnings are not imposed because the questioning is conducted in a certain place or because the person being questioned is suspected of having committed some offense. United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990). "Interrogation includes not only express questioning by an officer, but also any words or actions that 'police should know are reasonably likely to elicit an incriminating response from the suspect.' " United States v. Ochoa-Gonzalez, 598 F.3d 1033, 1038 (8th Cir. 2010) (quoting Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000)). However, the police "cannot be held accountable for the unforeseeable results of their words or actions." Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980). Thus, "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response" Id. at 302. Finally, "Miranda does not bar the government from introducing into evidence spontaneous statements made

during a conversation not initiated by the officer." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996)). "Whether a particular statement constitutes an interrogation depends upon the circumstances of each case, but we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005). An officer's statement of fact is not a plea to a defendant's conscience, and absent coercive pressure, it is not likely to elicit incriminating information. Chipps, 410 F.3d at 445.

The conversation between the defendant and Deputy Milstead at the CID was not an interrogation. Deputy Milstead expressly informed the defendant he was being detained on a mental hold. As he testified at the suppression hearing, he was seeking to de-escalate the situation because the defendant was becoming agitated. HT at 61. The entire context of the conversation demonstrates Deputy Milstead was not conducting a criminal investigation or seeking incriminating statements from the defendant. While he asked a few questions of the defendant, he was generally seeking agreement from the defendant about prior statements he made—generally about hearing voices, not taking medication, and smoking marijuana frequently. He also was answering the defendant's questions or responding to comments the defendant made while Deputy Milstead was explaining the mental hold.

If the statements Deputy Milstead made in explaining the situation statements made at the CID are found to constitute interrogation, the statements

10

the defendant made before receiving <u>Miranda</u> warnings would not be admissible. While still discussing voices in his head, Deputy Milstead asked about the voices. When the defendant commented about voices telling him to kill the President, Deputy Milstead paused for several seconds. As he noted at the suppression hearing, Deputy Milstead at that point realized the conversation with the in-custody defendant was potentially going to turn into one about a crime. He provided the defendant with the <u>Miranda</u> warnings. After the defendant agreed to waive his rights and to talk, Deputy Milstead conducted the interview.

## CONCLUSION

Based on the foregoing, as well as the United States' previous memorandum, the United States respectfully requests this Court deny the defendant's motion to suppress.

Dated this 14th day of December, 2020.

RONALD A. PARSONS, JR.
United States Attorney
By:

*/s/ Eric Kelderman*

_____

Eric Kelderman
Assistant United States Attorney
515 Ninth Street, Suite 201
Rapid City, SD 57701
Telephone:  (605) 342-7822
Email:  Eric.Kelderman@usdoj.gov